553 So.2d 148 (1989)
Bernard SHAKTMAN, et al., Petitioners,
v.
STATE of Florida, Respondent.
No. 72272.
Supreme Court of Florida.
October 12, 1989.
Rehearing Denied December 28, 1989.
*149 Mel Black, Alan Karten and Martin Saxon, Miami, Alan E. Weinstein, Miami Beach, Harvey N. Shenberg, Miami, and Nathaniel Barone, Jr., Coral Gables, for petitioners.
Robert A. Butterworth, Atty. Gen., and Michele L. Crawford, Asst. Atty. Gen., Miami, and Janet Reno, State Atty., and Joel D. Rosenblatt, Asst. State Atty., Miami, for respondent.
BARKETT, Justice.
We have for review Shaktman v. State, 529 So.2d 711, 719 (Fla. 3d DCA 1988), in which the district court certified the following two questions to be of great public importance:[1]
(1) Whether article I, section 23, of the Florida Constitution[[2]] is implicated when a law enforcement agency installs a pen register device[[3]] on the telephone of an individual?
(2) If the answer to (1) is yes, then is the compelling state interest test satisfied if the law enforcement agency involved in the installation has founded suspicion and meets the criteria established by sections 119.011(3)(a), (b), (c) and 119.011(4)[, Florida Statutes (1983)]?
We approve the decision of the district court and, in the context of this case, answer both questions in the affirmative.
Petitioners were charged by information on November 13, 1984, with violation of the Racketeer Influenced and Corrupt Organization statute,[4] conspiracy to violate that statute, bookmaking,[5] and conspiracy to commit bookmaking. The Miami Beach Police Department received information from an undisclosed person that petitioner *150 Shaktman, a probationer from a prior bookmaking conviction,[6] was again engaged in similar criminal activity. An investigation was conducted to determine whether Shaktman was involved in illegal gambling. During the physical surveillance of Shaktman on October 12, 1983, investigators observed him at a Miami Beach cafe conversing with petitioner Mart, who was known to police for his gambling and bookmaking activities, and with Norman Rothman, who was known to police to have a lengthy felony record. Shaktman was overheard discussing illegal gambling activites. Physical surveillance was thereafter extended to petitioner Mart.
On November 28, 1983, the circuit court approved the state's motion for a lease line for pen register operation on three instruments located in petitioner Mart's Miami Beach apartment. Pen register activity was provided from December 6, 1983, until January 17, 1984, when the state received court approval of its application to intercept wire and oral communication. Ultimately, the information obtained from that intercept, together with the information obtained from a concurrent investigation by the Metro-Dade Police Department, led to the filing of formal charges.
The circuit court denied petitioners' consolidated motions to suppress evidence and to dismiss the information. The district court affirmed the circuit court and concluded that although article I, section 23 of the Florida Constitution applies to the facts of this case, the governmental intrusion by a criminal justice agency as defined in section 119.011(4), for the purposes defined in section 119.011(3), was permitted because the government satisfied the compelling state interest test. Shaktman, 529 So.2d at 716. We approve.
In Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), Justice Brandeis wrote:
The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect... . They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the government, the right to be let alone  the most comprehensive of rights and the right most valued by civilized men.
Id. at 478 (Brandeis, J., dissenting).
Fifty-two years later, while legal scholars continued to debate whether the federal constitution provided express or implied privacy protections, the people of Florida unequivocally declared for themselves a strong, clear, freestanding, and express right of privacy as a constitutional fundamental right. This provision was approved by the voters as article I, section 23 of the Florida Constitution, adopted in 1980, when the people exercised their sovereign power to amend the state's organic law.
This right ensures that individuals are able "to determine for themselves when, how and to what extent information about them is communicated to others." A. Westin, Privacy and Freedom 7 (1967). See also T. Emerson, The System of Freedom of Expression 548 (1970) (arguing that "the main thrust of any realistic system for the protection of privacy" must be the prevention of "outside persons from obtaining information about individuals seeking privacy"). One of its ultimate goals is to foster the independence and individualism which is a distinguishing mark of our society and which can thrive only by assuring a zone of privacy into which not even government may intrude without invitation or consent.
The right of privacy, assured to Florida's citizens, demands that individuals be free from uninvited observation of or interference in those aspects of their lives which fall within the ambit of this zone of privacy unless the intrusion is warranted by the necessity of a compelling state interest. In an opinion which predated the adoption of section 23, the First District aptly characterized the nature of this right:
A fundamental aspect of personhood's integrity is the power to control what we *151 shall reveal about our intimate selves, to whom, and for what purpose.
Bryon, Harless, Schaffer, Reid & Assocs., Inc. v. State ex rel., Schellenberg, 360 So.2d 83, 92 (Fla. 1st DCA 1978), quashed and remanded on other grounds, 379 So.2d 633 (Fla. 1980). Because this power is exercised in varying degrees by differing individuals, the parameters of an individual's privacy can be dictated only by that individual. The central concern is the inviolability of one's own thought, person, and personal action. The inviolability of that right assures its preeminence over "majoritarian sentiment"[7] and thus cannot be universally defined by consensus.
The telephone numbers an individual dials or otherwise transmits represent personal information which, in most instances, the individual has no intention of communicating to a third party. This personal expectation is not defeated by the fact that the telephone company has that information. As the Supreme Court of Colorado noted:
The concomitant disclosure to the telephone company, for internal business purposes, of the numbers dialed by the telephone subscriber does not alter the caller's expectation of privacy and transpose it into an assumed risk of disclosure to the government.... [I]t is somewhat idle to speak of assuming risks in a contexts where, as a practical matter, the telephone subscriber has no realistic alternative.
People v. Sporleder, 666 P.2d 135, 141 (Colo. 1983) (citations omitted).
We agree with the Third District that the privacy interests of article I, section 23 are implicated when the government gathers telephone numbers through the use of a pen register. See Winfield v. Division of Pari-Mutuel Wagering, 477 So.2d 544, 548 (Fla. 1985). This gathering of private information clearly affects a matter within that zone of privacy. Accordingly, we adopt the analysis of the district court and answer the first certified question in the affirmative.[8]
Having found that petitioners were entitled to the protections of article I, section 23, the district court nevertheless permitted the installation of pen registers, concluding that the compelling state interest test required by article I, section 23, had been satisfied in this case. Shaktman, 529 So.2d at 718.
Like all of our other fundamental rights, the fundamental right of privacy is not absolute. In Winfield, the Court found that while a citizen may enjoy a privacy interest in his or her bank records, that privacy interest must yield to the interest of the state under certain circumstances. Justice Adkins, writing for the Court, explained that
[t]he right of privacy is a fundamental right which we believe demands the compelling state interest standard. This test shifts the burden of proof to the state to justify an intrusion on privacy. The burden can be met by demonstrating that the challenged regulation serves a compelling state interest and accomplishes its goal through the use of the least intrusive means.
Winfield, 477 So.2d at 547 (citations omitted). The Court recognized in Winfield that the compelling state interest test represented a strong standard of review, one of the more demanding placed upon the government.[9]
We agree with the district court that the compelling state interest test articulated in Winfield must be applied to the issue before us. Because the pen register intrudes upon fundamental privacy interests, the state has the burden of demonstrating both that the intrusion is justified *152 by a compelling state interest and that the state has used the least intrusive means in accomplishing its goal.
We also agree with the state that a legitimate, ongoing criminal investigation satisfies the compelling state interest test when it demonstrates a clear connection between the illegal activity and the person whose privacy would be invaded. To justify the intrusion into private lives by the use of a pen register, article I, section 23 requires that the state demonstrate two things. First, it must show a reasonable founded suspicion[10] that the targeted telephone line was being used for a criminal purpose. We are satisfied on this record that the law enforcement agencies had such a reasonable founded suspicion.
Second, the state must show that the least intrusive means have been employed. Petitioners contend that the state has failed to demonstrate that the use of the pen register was the least intrusive means available to accomplish its goal. Petitioners urge that the procedural requirements imposed by current federal[11] and state[12] statutes offer more enhanced protection than that offered under then-controlling law, thereby demonstrating that less intrusive means were available. Specifically, petitioners argue that the trial court omitted from its order a limit on the duration of its use, the type of information sought, a statement demonstrating founded suspicion, and the making of periodic reports to the authorizing court.
As a crucial component of the second prong of this analysis, article I, section 23 requires adherence to procedural safeguards which, at a minimum, necessitate judicial approval prior to the state's intrusion into a person's privacy. Thus, in analyzing whether the least intrusive means were utilized, one must consider procedural safeguards in conjunction with the extent of the actual intrusion into privacy. There is no question that the law enforcement agencies in this case applied for pen register operation in accordance with established state procedures at the time of the request and that the authorizing court complied with those procedures.
We find from the record that the order which authorized the pen register application was based upon reasonable founded suspicion. Furthermore, although the order did not set a time limit for the duration of the pen register, pen register surveillance continued for a period of time less than that authorized by the current legal requirement.[13] Considering all the circumstances, we find that the pen register installed here was the least intrusive means and we are satisfied that there was no procedural violation which would defeat the application of this standard.
Accordingly, for the reasons expressed, we answer the certified questions in the affirmative and approve the decision of the district court.
It is so ordered.
OVERTON, McDONALD, SHAW, GRIMES and KOGAN, JJ., concur.
EHRLICH, C.J., concurs specially with an opinion.
EHRLICH, Chief Justice, concurring specially.
I concur. I write only to emphasize the method by which we determine the applicability *153 of article I, section 23, of the Florida Constitution. In Winfield v. Division of Pari-Mutuel Wagering, 477 So.2d 544, 548 (Fla. 1985), this Court stated:
The citizens of Florida opted for more protection from governmental intrusion when they approved article I, section 23, of the Florida Constitution. This amendment is an independent, freestanding constitutional provision which declares the fundamental right to privacy. Article I, section 23, was intentionally phrased in strong terms. The drafters of the amendment rejected the use of the words "unreasonable" or "unwarranted" before the phrase "governmental intrusion" in order to make the privacy right as strong as possible. Since the people of this state exercised their prerogative and enacted an amendment to the Florida Constitution which expressly and succinctly provides for a strong right of privacy not found in the United States Constitution, it can only be concluded that the right is much broader in scope than that of the Federal Constitution.
The words "unreasonable" or "unwarranted" harken back to the federal standard of "reasonable expectation of privacy," which protects an individual's expectation of privacy only when society recognizes that it is reasonable to do so. The deliberate omission of such words from article I, section 23, makes it clear that the Florida right of privacy was intended to protect an individual's expectation of privacy regardless of whether society recognizes that expectation as reasonable.
However, this emphasis on each individual's expectations of privacy does not mean that the individual's subjective expectations are dispositive of the applicability of article I, section 23. In Winfield, this Court characterized the interest protected as "an individual's legitimate expectation of privacy." Id. (emphasis added). Therefore, the zone of privacy covered by article I, section 23, can be determined only by reference to the expectations of each individual, and those expectations are protected provided they are not spurious or false. A determination of whether an individual has a legitimate expectation of privacy in any given case must be made by considering all the circumstances, especially objective manifestations of that expectation; for example, in cases where disclosure of purportedly private information is sought, circumstances such as the kind of information, where is it kept, who has access to it and under what circumstances.
In this case, the information sought was the telephone numbers dialed by an individual. Access to this information is very limited. Although the telephone company has the information, its records are not open to the public. As with the bank records at issue in Winfield, the individual certainly expected that the information would not be released without authorization. Such personal and private information comes within the zone of privacy protected by article I, section 23, of the Florida Constitution.
NOTES
[1] We have discretionary jurisdiction. Art. V, § 3(b)(4), Fla. Const.
[2] That section provides:

Every natural person has the right to be let alone and free from governmental intrusion into his private life except as otherwise provided herein. This section shall not be construed to limit the public's right of access to public records and meetings as provided by law.
[3] The Florida Statutes define a pen register as:

a device which records or decodes electronic or other impulses which identify the numbers dialed or otherwise transmitted on the telephone line to which such device is attached ... § 934.02(20), Fla. Stat. (Supp. 1988). See also 18 U.S.C. § 3126(3) (1988); United States v. New York Tel. Co., 434 U.S. 159, 161 n. 1, 98 S.Ct. 364, 366-67 n. 1, 54 L.Ed.2d 376 (1977); United States v. Giordano, 416 U.S. 505, 549 n. 1, 94 S.Ct. 1820, 1842 n. 1, 40 L.Ed.2d 341 (1974) (Powell, J., concurring in part and dissenting in part). See generally J. Carr, The Law of Electronic Surveillance § 3.2(c)(2)(B) (1988); 2 G. Trubow, Privacy Law and Practice § 11.04[8] (1988).
[4] § 895.03, Fla. Stat. (1983).
[5] § 849.25, Fla. Stat. (1983).
[6] Shaktman v. State, 433 So.2d 580 (Fla. 3d DCA 1983).
[7] L. Tribe, American Constitutional Law 1311 (2d ed. 1988).
[8] We add that the district court concluded and the petitioners now concede that article I, section 12 of the Florida Constitution, is not implicated by the facts of this case.
[9] Such a standard is entirely appropriate in view of the fact that the drafters of article I, section 23 intended to make the right to privacy as strong as possible. Winfield v. Division of Pari-Mutuel Wagering, 477 So.2d 544, 548 (Fla. 1985). See also Cope, To Be Let Alone: Florida's Proposed Right of Privacy, 6 Fla.St.U.L.Rev. 673, 744-50 (1978).
[10] In deciding whether police had founded suspicion of criminal activity sufficient to justify a stop of a motor vehicle, the Court has looked to "the cumulative impact of the circumstances perceived by the officers." Kehoe v. State, 521 So.2d 1094, 1096 (Fla. 1988). Accord Tamer v. State, 484 So.2d 583, 584 (Fla. 1986). We find that definition to be suitable for the inquiry at hand, when coupled with the added requirement that such suspicion must be reasonable.
[11] 18 U.S.C.A. §§ 3121-3127 (West Supp. 1986) (effective ninety days after October 21, 1986. Pub.L. No. 99-508, § 302, 1986 U.S.Code Cong. & Admin. News (100 Stat.) 1872).
[12] §§ 934.32-934.33, Fla. Stat. (Supp. 1988) (effective October 1, 1988. Ch. 88-184, § 11, Laws of Fla.).
[13] We add that there is no statutory requirement for the making of periodic reports relative to pen register operation; however, the issuing court may require periodic reports in connection with the interception of wire, oral, or electronic communication. § 934.09(6), Fla. Stat. (Supp. 1988).